**ANCHORAGE CHRYSLER CENTER, INC., Appellant,**

v.

**DAIMLERCHRYSLER CORPORATION, Appellee.**

No. S–11421.

Supreme Court of Alaska.

Feb. 24, 2006.

Randall Simpson, Blair M. Christensen, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant.

Jeffrey M. Feldman, Ruth Botstein, Feldman & Orlansky, Anchorage, and Mark F. Kennedy, Mark T. Clouatre, Wheeler Trigg

Kennedy LLP, Denver, Colorado, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

### OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

This appeal arises out of a dispute between an automobile manufacturer and one of its dealers in Anchorage. The dealer and the manufacturer entered into a short letter agreement that required (among other things) the dealer to make certain changes to its facilities in return for the right to open a new dealership in Wasilla. The parties' relationship deteriorated: the dealer refused to remodel its dealership as the manufacturer wanted, and the manufacturer ended up opening a competing dealership in Anchorage. The car dealership sued the manufacturer, alleging breach of contract, misrepresentation, and breach of the covenant of good faith and fair dealing. After a bench trial, the superior court made findings of facts and conclusions of law, and entered judgment in favor of the manufacturer on all claims. We believe the superior court erred in failing to consider (1) the dealer's entitlement to declaratory relief on what facility changes the agreement required, notwithstanding the dealer's failure to attempt such changes; (2) whether alleged half-truths about the manufacturer's plans to open a new dealership amounted to a misrepresentation by the manufacturer; (3) whether the manufacturer failed to supply a letter of intent authorizing the dealer to open a store in Wasilla, as the agreement required; and (4) whether the manufacturer breached the covenant of good faith and fair dealing. We vacate the superior court's judgment and remand the case for further consideration.

## II. BACKGROUND

The account below is drawn primarily from the superior court opinion, which has not been overtly challenged as wrong on the facts.

During the period relevant to this dispute, plaintiff Anchorage Chrysler Center (ACC) operated a dealership selling Chrysler, Plymouth, and Dodge vehicles, all of which were distributed to ACC by defendant Daimler-Chrysler Motors Company, LLC (DCMC) (formerly known as DaimlerChrysler Motors Corporation). ACC sold the vehicles out of two adjacent buildings on Fifth Avenue: Plymouths and Chryslers were sold out of one building, and Dodges out of the other. ACC operated the dealership pursuant to "Sales and Service Agreements" between ACC and DCMC.

These sales and service agreements gave DCMC the right to authorize other dealers to sell the same cars in the same locality as DCMC "determines to be appropriate." The other DCMC dealer in Anchorage was Johnson Jeep. The only DCMC models Johnson Jeep carried were Jeep and Eagle.

In the mid–1990s, DCMC developed a merchandise strategy it called Project 2000. Dealers were encouraged to sell Dodge vehicles in facilities that were separate from the facilities used to sell Chrysler, Plymouth, Jeep, and Eagle vehicles. DCMC, ACC, and Johnson Jeep entered into discussions about how to achieve Project 2000's goal of the same dealer selling the Chrysler, Plymouth, Jeep, and Eagle lines. DCMC and ACC began to negotiate what would eventually become a letter agreement between ACC and DCMC under which ACC would not object to Johnson Jeep's selling Chryslers and Plymouths. As part of this letter agreement, DCMC required ACC to rearrange its showrooms so that Dodges would be sold in what had been the Chrysler/Plymouth showroom, with the other lines (including a new Jeep line) moving to the former Dodge showroom. As part of the deal DCMC would also agree to authorize ACC to open a Dodge dealership in Wasilla.

Getting this letter agreement signed involved a long period of negotiation, extending over several years and involving some false starts. One source of contention was the Wasilla part of the deal, which ultimately took the form of a letter of intent that DCMC was required to provide as one of its obligations under the letter agreement. An-

other concern ACC had (though the degree to which this concern was reflected in the parties' deal is disputed on this appeal) was whether DCMC would establish another Dodge dealership in Anchorage to compete against ACC's lucrative Dodge franchise. In March 1999, as the negotiations began to enter the home stretch, DCMC's in-house lawyer David King sent an email to ACC's lawyer, attaching a rough draft of a Wasilla letter of intent. Under this draft of the letter of intent, ACC could get a dealership in Wasilla if it began constructing the dealership over time periods to be determined (i.e., the draft had blanks for all the milestones). This letter of intent draft also addressed the issue of other Dodge stores in Alaska, by obligating ACC not to protest if DCMC established another dealer selling the same lines as ACC. The cover memo by DCMC's lawyer explained to ACC's lawyer that any disagreement over this language "should be resolved as a result of the understandings already reached. My clients have not informed me of any plans for additional dealerships in Alaska." Later, after DCMC had announced that it would open another Dodge dealership in south Anchorage, this statement became one basis of ACC's claim that DCMC had promised or represented not to open another Dodge store.

ACC responded by proposing revised language for the letter agreement. The letter agreement proposed by ACC deleted all references to DCMC's providing a letter of intent and required ACC to "commit" to a new Wasilla dealership within five years.[1] ACC also proposed new language that would commit the parties to the proposition that the Project 2000 agreements between ACC, DCMC, and Johnson Jeep "does not include the Dodge franchise"—language apparently intended to insure that Johnson would not get Dodge. On May 21, 1999, DCMC responded with a letter from Carl Fleck, DCMC's regional manager. DCMC said it was unnecessary to add language to the agreement precluding DCMC from giving Johnson Jeep a Dodge dealership: "As to

awarding a Dodge Sales and Service agreement to Johnson Jeep, I can confirm that DaimlerChrysler has no plan to add Dodge to this dealership." This would become another statement used to support ACC's claim that DCMC had at least implicitly promised or represented not to start a new Dodge dealership in Anchorage.

The May 21 DCMC letter also seemed to reject ACC's Wasilla proposal. Fleck enclosed another draft of the letter of intent, which was not signed by DCMC but looked ready to be signed by both parties. Under this version of the letter of intent, DCMC promised to award ACC a Wasilla dealership for Dodge and all other DCMC vehicles, provided ACC met certain milestones. Under this draft of the letter of intent, the first milestone—proposal of a suitable site for the dealership—needed to be met by June 2002 (a little more than three years) and ACC had to finish the dealership by July 2004 (a little more than five years).[2] One of the issues in this appeal is whether this May 21 letter of intent was in form and substance the letter of intent contemplated by the letter agreement that was concluded a few days later.

On May 28, 1999, ACC and DCMC had a conference call, attended by Fleck on DCMC's side and by several managers on ACC's side. What happened on the call was disputed at trial. First, ACC asked about the letter agreement's requirement that ACC establish "separate" and "complete" showrooms for Dodge on the one hand and for Chrysler/Plymouth/Jeep on the other. According to the superior court's findings, Fleck told ACC that because ACC already had two showrooms and combined service and parts facilities and staff, the changes needed would be minor. ACC also asked Fleck about Dodge. What was said on this point was hotly disputed at trial. ACC witnesses testified that Fleck responded by promising not to put a new Dodge dealership of any kind in Anchorage. But the superior court found (based on Fleck's testimony) that

---

**1.** This "commitment" by ACC was initially made subject to "viable economic" circumstances, although a few weeks later ACC agreed to drop this particular condition.

**2.** Unlike DCMC's prior draft, this letter of intent did not contain any language that purported to preclude ACC from opposing DCMC's establishment of competing dealers.

Fleck made only a "brief reference to Dodge" and "only in the context of what [Johnson Jeep] was to get (or rather to confirm what [Johnson Jeep] would not get)."

The letter agreement giving rise to this litigation is dated May 26, 1999. ACC signed the agreement on May 28, 1999, after the parties' conference call; DCMC signed it on June 1, 1999.[3] The letter contains three bullet points. The first bullet bestows a Jeep dealership on ACC, contingent on ACC's establishment of "separate" and "complete" facilities. The second bullet says that ACC will not object to DCMC's giving Johnson Jeep the Chrysler and Plymouth franchises (no mention is made of Dodge). The third bullet says DCMC "will provide" ACC with "its standard five year Letter of Intent." Altogether, the three bullets read as follows:

- Subject to [ACC's] meeting [DCMC's] qualification requirements, DCMC will enter into its standard Jeep Sales and Service Agreements with ACC. As a part of meeting DCMC's qualification requirements ACC will establish a complete Chrysler, Plymouth, Jeep ("CPJ") operation in ACC's current Dodge dealership facilities. As a result, ACC will establish a separate Dodge dealership operation with a separate dealer code in ACC's current Chrysler Plymouth dealership facility. ACC may choose to set up a separate legal entity under which the Dodge dealership will operate or ACC may operate each of the two dealerships under ACC's existing corporate entity with separate d/b/a names for the CPJ and Dodge operations.

- ACC understands and agrees that subject to Johnson Jeep meeting DCMC's qualification requirements, DCMC will enter into its standard Chrysler and Plymouth Sales and Service Agreements with Johnson Jeep at Johnson Jeep's current Jeep location. ACC agrees to not protest or oppose this establishment in any administrative, court or other proceeding.

- DCMC will provide You and ACC with its standard five year Letter of Intent giving You and ACC the right to qualify and be approved as a Dodge, Chrysler, Plymouth and Jeep dealership in the Wasilla, Alaska Sales Locality. Such a Letter of Intent will be conditioned upon You and ACC meeting DCMC's standard dealership qualifications applicable to the Wasilla, Alaska Sales Locality, including the requirement of adequate facilities. The Letter of Intent will be drafted to become effective as of the date of the standard Jeep Sales and Service Agreement referenced above.

Soon after signing, the parties disagreed about what changes ACC had to make to its showrooms to make each "complete" and "separate" under the agreement. DCMC wanted separate managers, separate service areas, separate parts counters, separate sales staff, separate financial statements, and separate dealer codes. ACC understood the changeover merely to involve using separate dealer codes, swapping signs, and making other minor modifications.

In September 1999, without making any attempt to create "separate" and "complete" facilities, ACC filed its complaint in this action. DCMC had never sent any Jeeps to ACC, and never (after May 21) sent ACC another letter of intent for a Wasilla dealership. The complaint alleged, among other things: (1) that, by insisting on a significant transformation of ACC as a precondition to receiving Jeeps, DCMC breached the May 28 agreement and violated the duty of good faith and fair dealing; (2) that DCMC misrepresented its intention not to establish a dealer in south Anchorage; (3) that DCMC breached its promise to give ACC five years to establish a dealership in Wasilla; and (4) that a new dealership would violate the agreement and the covenant of good faith and fair dealing. The complaint sought declaratory relief, injunctive relief, and compensatory and punitive damages.

---

**3.** According to the terms of the letter agreement, it became effective on June 1, 1999, the date that it was signed by an authorized representative of DCMC. The superior court chose to refer to the letter agreement as the May 28 letter agreement, based on the date ACC signed the agreement. For purposes of clarity, we will continue to refer to the agreement as the May 28 letter agreement.

Less than two months after the complaint was filed, DCMC formally approved a plan to open a new Dodge store in south Anchorage, although not at Johnson Jeep.

The matter eventually came to a bench trial before Superior Court Judge William F. Morse. He issued findings of facts and conclusions of law rejecting ACC's claims (though one issue on this appeal is whether the opinion actually addresses certain claims), and on this basis entered a judgment dismissing all claims against DCMC. The superior court's rulings will be discussed in detail below, but can be summarized briefly. Rejecting ACC's claim that DCMC breached the contract by failing to provide Jeeps, the court held that the contract required ACC to make at least some changes to its facilities, and that without attempting to make such changes ACC could not complain of any breach by DCMC. On the issue of the new Dodge dealership in south Anchorage, the court rejected ACC's contractual claims after finding that DCMC never promised to refrain from establishing an entirely new dealership. The court also rejected ACC's claim that DCMC misrepresented its intentions to open a new Dodge dealership, finding that ACC was not justified in relying on the hedged statements made by DCMC, that ACC did not actually rely on these statements, and that the statements were technically true. As to the Wasilla letter of intent, the court found that DCMC, having sent a letter of intent on May 21 (a few days before the letter agreement was signed), was not required to send another letter of intent under the letter agreement, at least when ACC had never requested that DCMC send such a new letter of intent.

## III. DISCUSSION

■ ACC has four claims on appeal. First, it argues that the superior court should have determined what facilities changes the letter agreement required ACC to make as a precondition to getting Jeeps. Second, it argues that the superior court erred in finding that the letter agreement did not include a promise by DCMC to refrain from opening a new Dodge store in Anchor-

age. Relatedly (and we will consider these points together), ACC argues that it was entitled to rely on DCMC's statements about a new Dodge dealership in Anchorage, and that these statements were half-truths actionable as misrepresentations under Alaska law. Third, ACC argues that the superior court erred in finding that the May 21 letter of intent was the letter of intent contemplated under the letter agreement, and further erred in requiring ACC to demand a new letter of intent when the letter agreement imposed no such requirement. Fourth, ACC argues that the superior court erred by failing to discuss altogether ACC's claim for breach of the covenant of good faith and fair dealing. As discussed below, these allegations of error raise mostly (but not entirely) legal issues, and to this extent our review will be de novo.[4]

### A. The Jeep Agreement and the Facilities Makeover

■ The May 28 letter agreement required ACC to establish a Dodge dealership and a "separate" Chrysler/Plymouth/Jeep dealership on its adjoining properties on Fifth Avenue (and more specifically to put the new Dodge operation in ACC's existing Chrysler/Plymouth property, with the new Chrysler/Plymouth/Jeep operation to be located on the former Dodge property). This was made a condition of ACC's receipt of a Jeep dealership. The Chrysler, Plymouth, Jeep dealership needed to be a "complete" operation and the Dodge dealership needed to be "separate." Shortly after signing the May 28 agreement, ACC and DCMC developed a disagreement about what changes ACC needed to make to satisfy the "complete" and "separate" requirements. The sticking point appears to have been that DCMC wanted not just separate dealer codes and different signs for each building but separate managers and separate parts and service departments in each of the two operations. ACC contends that these demands contradicted assurances DCMC made before the agreement was signed, to the effect that the changes required by this condition would be "simple and easy." ACC never even at-

4. *In re Schmidt,* 114 P.3d 816, 820 (Alaska 2005).

tempted to separate its business along the lines contemplated by the agreement, whether under ACC's interpretation of the agreement or DCMC's. Instead it filed the complaint in this case. After amendments, the complaint alleged that DCMC breached the contract by not providing Jeeps; sought damages based on this breach; and sought a declaration that DCMC "must provide Jeep vehicles to [ACC] under its standard sales and service agreement without requiring [ACC] to build and maintain additional repair and parts facilities or retain a second general manager." ACC never got the Jeep dealership.

While the superior court seemed inclined to accept ACC's version of the facts,[5] it never decided whose understanding of the agreement was correct. Instead, the court relied on the undisputed fact that ACC never attempted to make whatever transformation might have been required by the May 28 agreement:

> [Rod] Udd [ACC's president and primary shareholder] could have made changes to ACC in short order, but he wanted more. That was an unfortunate decision.
>
> DCMC did not breach the agreement by not shipping ACC Jeeps. ACC failed to comply with the precondition. ACC did not substantially comply with the transformation requirements. Thus, DCMC was excused from shipping the Jeeps.

The superior court seems to have understood ACC's obligation to establish separate facilities as a condition precedent to ACC's shipping the Jeeps. According to the Restatement of Contracts, "a condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before

performance under a contract becomes due."[6] The separate facilities requirement is such a condition, because the agreement says DCMC's obligation to provide Jeeps is "[s]ubject" to ACC's "meeting" the requirement of establishing "separate" facilities. Since it is also undisputed that ACC did not ever comply with the condition, DCMC was not required to perform its conditional duty to supply Jeeps. As the Restatement of Contracts says: "Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."[7] So the court was correct in holding that DCMC did not breach the agreement to supply Jeeps.

■ Yet notwithstanding ACC's failure to make any changes to its facilities, the superior court should have considered ACC's claim for a declaration specifying the facilities changes required by the letter agreement. Alaska Statute 22.10.020(g) says in part: "In case of an actual controversy in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought." We have said that declarations "concerning hypothetical or advisory questions or moot questions" should not be rendered,[8] and that relief may be withheld "when the grant of such relief would not terminate the controversy or the uncertainty which gave rise to the declaratory proceeding."[9] But declarations are appropriate where there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[10] As one federal court has use-

---

**5.** The superior court found that the issue of which party breached the Jeep deal "[was] the most difficult of the case," that there was "evidence that supports ACC's allegations," that DCMC may have made life difficult after the agreement was signed because it "clearly preferred to have different [dealers] in southcentral Alaska," and that some of DCMC's actions in the period after the agreement was signed "were more than a little troubling." The findings also state that "Fleck's subordinates were making demands that ACC did not perceive to be consistent with Fleck's earlier assurances of simplicity."

**6.** RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981).

**7.** *Id.* § 225(1); *see also Kennedy Assocs., Inc. v. Fischer,* 667 P.2d 174, 178 (Alaska 1983) (explaining that a plaintiff's failure to perform condition precedent is complete defense).

**8.** *Jefferson v. Asplund,* 458 P.2d 995, 999 (Alaska 1969) (citations omitted).

**9.** *Id.* at 998 (citations omitted).

**10.** *Id.* at 999 n. 20 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

fully stated (quoting Professor Borchard), the

> two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.[11]

■ The superior court apparently never considered ACC's claim for declaratory relief, but ACC has a strong case that these standards are met here. ACC asserts that the facilities changes demanded by DCMC would require "substantial" expenditures, and it seems obviously "useful" [12] for the superior court to issue a declaration stating whether or not these changes are required, particularly now that the court has taken so much evidence on the question. A declaration would also presumably end this part of the controversy between the parties. And although ACC's failure to fulfill a condition precedent bars its claim that DCMC breached this part of the letter agreement, it does not bar issuance of a declaration specifying what changes the letter agreement requires ACC to undertake in order to get Jeeps. Declaratory judgments are appropriate to resolve pre-breach disputes over contractual language, giving useful guidance for the parties or others contemplating a contingent course of action.[13]

Normally we review a superior court's decision to grant or refuse declaratory relief for abuse of discretion.[14] However, in light of the superior court's failure to address ACC's claim for declaratory relief,[15] and the apparent suitability of declaratory relief in this case, we vacate that part of the superior

---

**11.** *Broadview Chem. Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2d Cir.1969) (quoting Edwin Borchard, Declaratory Judgments 299 (2d ed.1941)), *cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970). If either prong is met, the action must be entertained. *Broadview Chem.,* 417 F.2d at 1001. The D.C. Circuit has made the test still more specific. Under its rule, the court should consider

> whether [declaratory relief] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of "procedural fencing"; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided.

*Jackson v. Culinary Sch. of Washington, Ltd.,* 27 F.3d 573, 580 (D.C.Cir.1994), *vacated and remanded for application of the correct standard of review by* 515 U.S. 1139, 115 S.Ct. 2573, 132 L.Ed.2d 824 (1995). Our cases on declaratory judgments generally follow federal cases construing the federal Declaratory Judgment Act. *Lowell v. Hayes,* 117 P.3d 745, 755 (Alaska 2005); *Jefferson,* 458 P.2d at 997 n. 7.

**12.** *Broadview Chem.,* 417 F.2d at 1001.

**13.** *See, e.g., Fidelity & Deposit Co. of Maryland v. City of Sheboygan Falls,* 713 F.2d 1261, 1265 (7th Cir.1983) (holding that where plaintiff was indemnified for certain amounts potentially owed by plaintiff to defendant, and where plaintiff had interest in collecting on indemnity quickly, declaratory action would lie to determine plaintiff's liability to defendant, even though defendant had not yet sought to collect from plaintiff); *Salomon Bros., Inc. v. Carey,* 556 F.Supp. 499, 502 (S.D.N.Y.1983) (permitting brokerage to bring a declaratory action to establish that it was not liable to its customer, even though customer had merely advised brokerage that he thought he had a claim and wanted to settle it: "This court's judgment will serve a useful purpose in alerting other Salomon Brothers customers ... of the legal consequences of Salomon Brothers' actions under both contract and agency law" and will "terminate the uncertainty and controversy giving rise to the proceeding."); *see also* 8 Catherine M.A. Mc Cauliff, Corbin on Contracts § 30.9 (rev. ed. 1999) ("Certain judicial remedies may be available and an action for them maintainable even before any 'breach' of contractual duty has occurred and while the duty [to perform] in question is still future and conditional.... For these purposes, declaratory judgments and equitable remedies are available.").

**14.** *Lowell,* 117 P.3d at 750 ("In light of the significant role of judicial discretion in the administration of declaratory judgment, we will reverse the dismissal of a declaratory judgment action that is not based on prudential grounds only when we find that the superior court abused its discretion."); *see also Wilton v. Seven Falls Co.,* 515 U.S. 277, 289–90, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

**15.** Of course, if it turns out that the relevant condition precedent (establishment of separate facilities and compliance with any other requirements) can for some reason no longer occur, the case for declaratory relief would be much weaker. *See* Restatement (Second) of Contracts § 225(2) ("Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.").

court's judgment dismissing ACC's claim for declaratory relief.[16] On remand, the superior court should determine whether the criteria for issuing a declaratory judgment are satisfied and, if so, decide whether DCMC's demands concerning creating separate dealership operations were in accordance with the May 28 agreement.[17]

## B. The New Dodge Dealership

At trial ACC claimed that in the negotiations leading up to the May 28 agreement, DCMC employees made three promises to ACC not to establish another Dodge dealership in Anchorage. ACC argues both that the superior court erred in failing to read the agreement to include these three alleged promises and also that the same statements constituted tortious misrepresentations. The three alleged statements and the court's rulings were as follows:

(i) A March 1999 email by David King, DCMC's in-house counsel, to ACC's attorney: "My clients have not informed me of any plans for additional dealerships in Alaska." The superior court found that this statement was true, because DCMC did not have a "concrete" plan to add a dealership when it made this statement. It also found that the statement was so "hedged" that ACC was not justified in relying on it, and that ACC did not in fact rely on it, in that it kept seeking "more formal assurances from DCMC."

(ii) A statement in the May 21, 1999 letter to ACC by DCMC manager Carl Fleck: "As to awarding a Dodge Sales and Service agreement to Johnson Jeep, I can confirm that DaimlerChrysler has no plan to add Dodge to the [Johnson Jeep] dealership." This was in response to a request by ACC to add language clarifying that the agreements between ACC, DCMC, and Johnson Jeep would "not include the Dodge franchise." [18] The superior court characterized Fleck's statement as merely "address[ing] [ACC President] Udd's oft-stated concern and understanding of the scope of the discussions that had been ongoing for over a year. Udd wanted to protect his Dodge franchise from [Johnson Jeep]."

(iii) A statement to ACC on a conference call by the same DCMC manager, the day ACC signed the agreement, allegedly to the effect that DCMC would not establish a Dodge dealership in south Anchorage. Fleck, the manager, testified that his statement was simply a confirmation that Johnson Jeep would not be getting a Dodge franchise, rather than a promise not to open an entirely new dealership. The court found Fleck's evidence more credible than ACC's. "The Court finds that it is not credible that Fleck, at this stage of the lengthy discussions regarding the realignment of vehicle lines between [Johnson Jeep] and ACC, and especially at the end of a brief, unexpected phone call, would agree to forego the placement of a Dodge dealership in south Anchorage."

---

**16.** *See Jackson v. Culinary Sch. of Washington, Ltd.,* 59 F.3d 254, 256 (D.C.Cir.1995) ("[W]e believe it essential for the district court to give explicit consideration to whether the case is appropriate for declaratory judgment.... [W]e find that a remand of the case is necessary so that the district court has an opportunity to *exercise* its discretion....").

**17.** A final issue is whether ACC has waived its entitlement to declaratory relief, here or in the superior court. We think there has not been a waiver. First, we believe ACC adequately raised the issue on appeal. Although ACC did not explicitly mention declaratory relief until its reply brief, its opening brief makes the argument in substance if not in form by contending that "the superior court failed to determine what the Agreement required ACC to do to transform its sales complex." In our view, this is good enough to avoid waiver. Second, we believe the

issue was adequately raised in the superior court. ACC's complaint quite plainly seeks declaratory relief. Declaratory relief is not explicitly mentioned in ACC's trial brief or in its proposed findings of fact and conclusions of law (both of which seek damages and delivery of Jeeps), but the latter seeks legal rulings that are effectively a declaratory judgment, including a proposed conclusion that ACC may comply with the May 28 agreement by implementing a "simple location swap and a signage change." We think this is enough to avoid any waiver in the superior court.

**18.** Rod Udd, the primary shareholder and president of ACC, had written DCMC: "I will add the Jeep line as part of the Project 2000, if the third paragraph of our agreement letter read[s] as follows: ... The Project 2000 agreement between [ACC], Johnson Jeep[,] and [DCMC] does not include the Dodge franchise."

■ These three statements are the basis of several issues on appeal. First, there is ACC's claim that the statements amount to additional promises that ought to be incorporated in the May 28 letter agreement. The only statement of the three that could possibly be construed as a promise (as opposed to a statement of present intention) is Fleck's statement on the May 28 phone call, which is number (iii) in the list above. But the superior court found, based on Fleck's testimony at trial, that Fleck made no such promise on the phone call. This is a factual finding reviewed for clear error.[19] Since the finding is supported by at least some evidence, we will not disturb it here.

■ The more difficult issue raised by ACC is whether the superior court properly considered whether the three statements might amount to a misrepresentation. Alaska cases follow the Restatement (Second) of Torts on what constitutes a fraudulent misrepresentation.[20] The Restatement identifies several elements of intentional misrepresentation: (1) a misrepresentation of fact or intention, (2) made fraudulently (i.e., with scienter), (3) for the purpose of inducing another to act in reliance, (4) with justifiable reliance by the recipient, (5) causing loss.[21]

■ The superior court rejected the misrepresentation claim related to the King email (paragraph (i), above) because it found the statement was technically true, because the statement was so "hedged" that ACC was not justified in relying on it, and because the court found that ACC did not in fact rely on the statement, in that ACC kept seeking "more formal assurances from DCMC." Whether the statement was misleading in spite of its being technically true is open to question; the problem of half-truths is discussed more below. But the finding that ACC did not justifiably rely on any misleading statement by King was an adequate basis to reject any misrepresentation claims based on the King email. ACC does not challenge the finding that it continued to seek assurances that there would be no new dealerships, and from this fact the superior court plausibly inferred that ACC did not actually rely on the King email. Moreover, the court did not err in finding that, even if there had been actual reliance by ACC on King's "hedged" statements, such reliance would have been "unreasonable." Although some courts appear to hold that determinations as to whether reliance was justified can be a question of law reviewed de novo,[22] our own precedents suggest that it is a question of fact,[23] and it seems that most jurisdictions that have addressed the issue say it is either a purely factual issue or a mixed question of law and fact, to be reviewed for clear error in either event.[24] We will therefore extend def-

19. *Hall v. TWS, Inc.*, 113 P.3d 1207, 1210 (Alaska 2005).

20. *Carter v. Hoblit*, 755 P.2d 1084, 1086–87 (Alaska 1988) (relying on Restatement).

21. RESTATEMENT (SECOND) OF TORTS § 525 (1977). The scienter requirement in the case of a claim of intentional misrepresentation is met where the speaker "knows or believes that the matter is not as he represents it to be," "does not have the confidence in the accuracy of his representation that he states or implies," or "knows that he does not have the basis for his representation that he states or implies." *Id.* § 526.

22. *Gardner v. Gardner*, 190 Wis.2d 216, 527 N.W.2d 701, 710 (App.1994) (holding that where there was no debate over the facts, the question of whether a particular statement was fraudulent and justifiably relied upon would be reviewed de novo), *review denied*, 531 N.W.2d 327 (Wis.1995).

23. *Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593, 601 (Alaska 2004) (holding that whether the level of trust between the parties to a settlement agreement was sufficient to justify reliance was an issue of fact that precluded summary judgment: "Whether reliance is justified in a given case seems to us more likely to turn on the course of dealings between the parties before and during the dispute."); *Ambassador Ins. Co. v. Kenneth I. Tobey, Inc.*, 618 P.2d 572, 574 (Alaska 1980) (holding that whether reliance was reasonable was one of many factual disputes precluding summary judgment).

24. *See, e.g., Minnesota Forest Prods., Inc. v. Ligna Machinery, Inc.*, 17 F.Supp.2d 892, 912 (D.Minn. 1998) (explaining that under Minnesota law, "[t]he question of whether a party justifiably relied upon another's representations is a question of fact for the jury"); *Smith v. Pope*, 103 N.H. 555, 176 A.2d 321, 325 (1961) ("[T]he conclusion that the plaintiffs' reliance was justified is implicit in the verdict. If a different view might have been taken upon the evidence, we cannot say that the trier of the facts who heard and saw the parties was compelled as a matter of law to adopt it."); *Bolser v. Clark*, 110 Wash.App. 895, 43 P.3d 62, 66 (2002) ("Whether a party justifi-

erence to the superior court's determination and reverse only if reasonable minds could not disagree that reliance was justified.[25] Under this standard, we think it was reasonable for the superior court to conclude that someone in ACC's shoes would have acted unreasonably in relying on King's statements as precluding new DCMC dealerships in south Anchorage. Since actual reliance and justifiable reliance are both prerequisites to claims of negligent and intentional misrepresentation,[26] the court did not err in rejecting ACC's claims that the King email was a misrepresentation.[27]

■■■ The superior court's treatment of the other two statements (the Fleck letter and the May 28 conference call with Fleck) is more problematic. The court did not directly address whether these statements were intentional or negligent misrepresentations, although it did find that Fleck's statements were merely true statements that DCMC did not intend to give Johnson Jeep the Dodge line. What is problematic is that the superior court did not appear to appreciate that a statement can be literally true and yet still be an actionable misrepresentation. Section 529 of the Restatement (Second) of Torts says: "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." [28] Under this standard, a partial disclosure is fraudulent if "the person making the statement knows or believes that the undisclosed facts might affect the recipient's conduct in

the transaction in hand." [29] The Restatement gives some examples, including a prospectus that fails to list all the company's debts; a statement that a title to land has been upheld by a particular court without mentioning that the court's decision has been appealed; and a statement that tenants in a building all pay a certain rent, without mentioning that the rent is still subject to approval by a rent control agency.[30] In addition, this court has held that a defendant's offer to pay property taxes on the plaintiffs' behalf might have implied that the plaintiffs owned the land, such as to give rise to at least a question of fact as to whether the defendant misled the plaintiffs about the status of their ownership interest.[31]

Here it appears that ACC was concerned that Johnson Jeep would get a Dodge dealership, apparently without adequately considering whether DCMC might withhold Dodge from Johnson Jeep and yet still open an entirely new Dodge dealership in Anchorage soon thereafter. DCMC may have known that a new Dodge dealership was a distinct possibility (even though it had not yet developed "concrete" plans), and that ACC would never sign the May 28 agreement if it appreciated the possibility of a new dealership. DCMC might therefore have decided to exploit ACC's tunnel vision by crafting its reassurances to ACC to cover Johnson Jeep and no more. These anyway are ACC's allegations, supported by at least some evidence, and there is little or nothing in the superior court opinion that rejects this version of the

ably relied is a question of fact unless reasonable minds could reach but one conclusion, in which case the issue may be determined as a matter of law."); cf. In re Rovell, 194 F.3d 867, 870–71 (7th Cir.1999) (holding that reasonable reliance is mixed question of law and fact, but is still reviewed for clear error: "The case law firmly establishes the proposition that a finding of reasonable reliance is reviewed for clear error. . . .").

25. Bolser, 43 P.3d at 66.

26. As noted above, justifiable reliance is an element of intentional misrepresentation. Restatement (Second) of Torts § 525. Section 552(1) of the Restatement makes "justifiable reliance" one of the elements of negligent misrepresentation.

27. Our conclusion that the King email was not in and of itself worthy of reasonable reliance should not preclude consideration of whether the King email helped create a context that made subsequent statements misleading.

28. This standard has been cited with approval by Alaska courts. See Carter, 755 P.2d at 1086.

29. Restatement (Second) of Torts § 529 cmt. b.

30. Id. § 529 cmt. a and illustration 2.

31. Carter, 755 P.2d at 1086.

facts.[32] Under this scenario, would DCMC's statements about withholding Dodge from Johnson Jeep, combined with King's earlier denial of knowing about any expansion, be "misleading because of [DCMC's] failure to state additional or qualifying matter"—namely, the likely possibility of a new Dodge dealership in Anchorage in the near future? Did DCMC know or believe "that the undisclosed facts might [have] affect[ed] the recipient's conduct in the transaction in hand"? The superior court seemed to focus on the literal truth of DCMC's statements, and does not appear to have considered these questions, even though ACC's pre-trial papers presented them in a straight forward fashion.[33]

Although the question of whether a misrepresentation exists is normally a question of fact, we think the superior court's failure to make factual findings appropriate to the relevant legal test (here, Section 529 of the Restatement (Second) of Torts) was an error of law, just as erroneous jury instructions are an error of law.[34] We appreciate that, even in ACC's version of events, these two statements were probably less radically incomplete than the illustrations provided in the Restatement (e.g., a company that fails to list all its debts), particularly since at least one of them, the May 21 letter, appears to have been made in response to a specific question by ACC about Johnson Jeep. Still, the question of whether the statements were fraudulent under the relevant standard is a question for the trier of fact, which in this case was the superior court.

Finally, DCMC argues that any oral misrepresentations about new dealerships are irrelevant, because ACC's basic sales and service agreements give DCMC the right to place new Dodge dealerships in Anchorage, and these same agreements cannot be amended except in writing. Yet the question is not whether DCMC retained a right, notwithstanding any oral misstatements, to establish another dealership in Anchorage under the sales and service agreements—if it were, DCMC might well be right to argue that any such statements would be irrelevant. Instead, the question is whether DCMC's alleged oral statements (which DCMC appears to have been reluctant to commit to writing) were a fraud inducing ACC to enter into the May 28 letter agreement. Put differently, an oral statement that would be unenforceable as a promise under the terms of Contract A may yet be a tortious misstatement if it induces the recipient of the statement to enter into Contract B.

For these reasons, we vacate the superior court's decision as to the claims that the two Fleck statements were negligent and/or intentional misrepresentations, and remand this part of the case for further consideration.

## C. The Wasilla Letter of Intent

In the days leading up to the May 28, 1999 agreement, the parties negotiated over the terms of a letter of intent by which ACC would obtain the right to open a dealership in Wasilla. DCMC sent a draft to ACC in March 1999 and then another draft on May 21, 1999. The parties did not sign either draft, although the May 21 draft appears to be a document in final form, without blanks or brackets. On May 28, 1999, ACC signed the short letter agreement that gave rise to this litigation. The letter agreement said that DCMC "will provide" ACC with its "standard five year Letter of Intent" to give ACC a dealership in Wasilla. The agree-

---

**32.** As the superior court pointed out, "Fleck testified that if, before completion of the Project 2000 realignment, DCMC had revealed to ACC ... DCMC's intent to open a south Anchorage Dodge, he doubted [ACC] would have consummated the realignment of vehicle lines."

**33.** ACC's Proposed Findings of Fact and Conclusions of Law referred to all three alleged misrepresentations and emphasized Fleck's testimony that he did not want to "spell ... out" DCMC's plans to open a new dealership. ACC's trial brief

noted that half-truths and true remarks that omit material information are actionable misrepresentations under Alaska law, relying on the *Carter* case cited above.

**34.** *See, e.g., Zaverl v. Hanley*, 64 P.3d 809, 817 n. 16 (Alaska 2003) (jury instructions); *Freeman v. Southwire Co.*, 269 Ga.App. 692, 605 S.E.2d 95, 96 (2004) (explaining that factual decisions "based on erroneous theories of law ... are subject to the de novo standard of review").

ment further stated that "[t]he Letter of Intent will be drafted to become effective as of the date of the standard Jeep Sales and Service Agreement referenced above." But DCMC did not send a letter of intent at any point after May 26, the day the letter agreement was dated, either in the May 21 version or in any other version. Similarly, ACC never signed the May 21 draft it had already received and it never asked DCMC to send a new one. In its complaint, ACC claimed by implication that DCMC's failure to send a new letter of intent was a breach of contract. The court rejected this claim, on the ground that ACC had a duty to sign the May 21 draft or ask for a new one:

> ACC might have read the May 1999 agreement to require that DCMC send a proposed LOI [letter of intent] after Udd signed on 28 May (whether different from the 21 May LOI or not). But ACC never made that demand to DCMC.

> ACC never demanded that the draft LOI be modified. Instead ACC did nothing to implement the May 1999 agreement concerning Wasilla. After ACC filed its lawsuit ... objecting to DCMC's demands concerning the transformation of the ACC sales complex, ACC and DCMC met without counsel to resolve their disagreements. They appeared to have made progress toward understanding and/or compromise. Nonetheless, ACC never signed the LOI. That was a breach of the 28 May 1999 agreement.

(Citations omitted.)

■ ACC argues that the superior court's ruling was erroneous for several reasons. First, ACC points out that the May 28 letter agreement says DCMC "will provide" a letter of intent, and DCMC never did so; there is no requirement that ACC make a

demand. ACC also argues the May 21 letter of intent cannot be the agreement contemplated by the May 28 letter agreement, because it requires ACC to take certain actions as soon as June 2002 and was therefore not the "five year Letter of Intent" referred to in the contract.

■ We do not agree with ACC that, merely because the May 21 letter of intent requires that some deadlines be met in less than five years, it cannot possibly be the "five year Letter of Intent" contemplated by the agreement. But we do think ACC is entitled to a remand on this issue. ACC is correct that there is nothing in the May 28 letter agreement that required ACC to demand that DCMC provide the letter of intent; DCMC's obligation to provide the letter of intent was unconditional. It is possible that ACC's failure to insist on this right could be an implied waiver of its right to be offered a letter of intent. But the standard for an implied waiver is high and factual findings are required.[35] The superior court in its opinion did not make findings on this subject.

But what about the May 21 letter of intent? If the May 21 letter of intent was in form and substance the "standard five year Letter of Intent" described in the May 28 agreement, the case would be simpler. Then DCMC's "breach," if any, would merely be its failure to re-send this letter of intent to ACC. And the damages flowing from such a picayune breach would probably be nominal, inasmuch as ACC essentially concedes that it ultimately refused to sign the agreement in this form. Yet the superior court did not make a finding as to whether the words "standard five year Letter of Intent" referred to the May 21 letter of intent or to an

---

**35.** This court has previously explained:

> An implied waiver arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party.... [T]here must be direct, unequivocal conduct indicating a purpose to abandon or waive the legal right, or acts amounting to an estoppel by the party whose conduct is to be construed as a waiver.

*Milne v. Anderson,* 576 P.2d 109, 112 (Alaska 1978) (citations omitted); *see also Wausau Ins. Cos. v. Van Biene,* 847 P.2d 584, 589 (Alaska 1993) (holding that "neglect to insist upon a right only results in an estoppel, or an implied waiver, when the neglect is such that it would convey a message to a reasonable person that the neglectful party would not in the future pursue the legal right in question" and refusing as a result to uphold a finding of implied waiver where evidence suggested mere "neglect or an internal mistake").

agreement having different terms. It explicitly refrained from deciding this question.[36] And there is at least some evidence suggesting that ACC was not satisfied with the May 21 letter of intent because it required ACC to meet some deadlines in less than five years, and that DCMC knew the May 21 letter of intent would have to be changed when the parties signed the May 28 letter agreement.[37] If it were the case that ACC understood the letter agreement to refer to a letter of intent with terms different from those in the May 21 letter of intent, and if DCMC knew this, ACC's understanding of "standard five year Letter of Intent" should prevail over DCMC's.[38] Alternatively, it may be that both parties understood "standard five year Letter of Intent" to mean different things, in which case the result may be there was no contract at all.[39] Or it may be that both parties understood the May 21 letter of intent was the one being referred to in the May 28 agreement, in which case the court's dismissal would prove to be the proper course after all.

We therefore remand the case to the superior court for additional findings, with directions to the court as follows. If it determines that both parties understood that the May 28 agreement referred to the May 21 letter of intent, then it should reject ACC's breach claim because it seems clear ACC never would have signed that letter of intent. If it believes that ACC had in mind a different letter of intent, and that DCMC was aware of this, then it should consider whether ACC implicitly waived its right to receive this letter of intent by failing to complain when DCMC did not send a revised letter of intent. This would require a consideration of the circumstances surrounding the contentious period that followed the signing of the letter agreement under the standards for an implied waiver described above. If there was no waiver by ACC, then DCMC's failure to send a revised letter of intent would amount to a breach of its obligation under the letter agreement to supply a letter of intent. Finally, if the court concludes that the parties did not have a meeting of the minds on what constituted the letter of intent so vaguely identified in the May 28 letter agreement, then the court may choose to take briefing on what remedy should issue.[40]

## D. The Covenant of Good Faith and Fair Dealing

■ ACC claimed several breaches of the covenant of good faith and fair dealing: (1) DCMC's failure to notify ACC that it intended to establish a new south Anchorage dealership, (2) its alleged revocation of the Wasilla letter of intent, and (3) its allegedly unreasonable demands for changes in ACC's facilities. ACC argued that these breaches were manifested by, among other things, the timing of DCMC's decision to open a new dealership (allegedly in retaliation for ACC's filing its complaint), and by DCMC's treat-

---

**36.** The superior court said: "ACC might have read the May 1999 agreement to require that DCMC send a proposed LOI after Udd signed on 28 May (*whether different from the 21 May LOI or not* )." (Emphasis added.)

**37.** DCMC manager Carl Fleck testified:
Q. In fact, did [ACC President Ron Udd] provide you any comments about this document [the May 21 letter of intent]?
A. This document?
Q. Correct.
A. The only comments that I'm familiar with is he was concerned about the time tables, the time—the numbers on here.
Q. Okay. And would that—and that was some—certainly something you were willing to work on?
A. Sure.

**38.** *See* Restatement (Second) of Contracts § 201(2)(a) (stating that where A understands contract to mean one thing, and B knows this, A's meaning prevails over B's).

**39.** *See id.* § 201(3) ("Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.").

**40.** *See id.* § 201 cmt. d ("There may be a binding contract despite failure to agree as to a term, if the term is not essential or if it can be supplied. *See* § 204. In some cases a party can waive the misunderstanding and enforce the contract in accordance with the understanding of the other party."); *id.* § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

ing Johnson Jeep more favorably than ACC. ACC also suggests that we should evaluate DCMC's conduct in light of "Relevant Market Area" legislation enacted in Alaska in 2002, by which car manufacturers are required (among other things) to give dealers notice and to have good cause before setting up another local dealership.[41]

As ACC points out, the superior court did not make any findings on these claims. The closest it came was when the court rejected the notion that Relevant Market Area legislation enacted after the dispute arose had any bearing on the case. With this much we agree; a court should not "anticipate" legislation imposing tort duties inconsistent with existing common law principles. But the court never decided or even mentioned whether DCMC's conduct might have otherwise violated the covenant of good faith and fair dealing, nor did it make the factual findings incident to such a ruling. We therefore vacate the superior court's judgment to the extent it fails to address these claims, and remand the case for consideration of this issue as well.

## IV. CONCLUSION

We VACATE the superior court's judgment insofar as it fails to consider (1) the claim for a declaration as to what ACC must do to receive Jeeps under the letter agreement; (2) the claim alleging misrepresentations by Fleck; (3) the breach of contract claim related to the Wasilla letter of intent; and (4) the claim for a breach of covenant of good faith and fair dealing. We also VACATE the superior court's attorney's fee award, inasmuch as it was based on DCMC's having prevailed on all claims.[42] The case is REMANDED to the superior court for further proceedings.

FABE, Justice, not participating.

---

41. AS 45.25.180.

42. ACC claimed that the attorney's fees awarded by the superior court to DCMC were too high and provided several examples of what it said was over-lawyering on DCMC's part. It is un-necessary to consider this challenge in light of our decision to vacate the superior court's resolution of the merits and the fee award that was based on the merits resolution.