**WASSER & WINTERS COMPANY,**
Appellant/Cross–Appellee,

v.

**RITCHIE BROS. AUCTIONEERS
(AMERICA), INC.,** Appellee/Cross–Appellant.

Nos. S–12581, S–12611.

Supreme Court of Alaska.

May 23, 2008.

Patrick G. Gilmore and Christopher J. Slottee, Atkinson, Conway & Gagnon, Anchorage, for Appellant.

Michael A. Grisham, Dorsey & Whitney, LLP, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

A creditor authorized an auctioneer to sell seven pieces of equipment in which the creditor held a security interest, and agreed to release its interest upon payment of "net proceeds" not to exceed the entire amount of debt owed to the creditor and subject to the payoff of a known senior lien. The creditor and auctioneer disagree about whether "net proceeds" was to include the proceeds from the sale of all of the debtor's equipment or only the equipment in which the creditor held a security interest. They also disagree on which party bears the risk of mistake due to the discovery of additional liens after the release of the creditor's interest. The superior court concluded that "net proceeds" was limited to the items in which the creditor held a collateral interest, reformed the contract to reflect payoff of all senior lien holders before payoff to the creditor, and granted summary judgment to the auctioneer. Because we determine that the superior court correctly declined to assign the risk of mistake to the auctioneer and therefore did not err in reforming the contract, we affirm the grant of summary judgment. We remand for further proceedings relating to the prevailing party's paralegal fees.

## II. FACTS AND PROCEEDINGS

Wasser & Winters, Inc. made loans to Ben A. Thomas, Inc., a logging company. Thomas's debt to Wasser was secured by liens on seven pieces of Thomas's equipment. In early 2004 Thomas hired Ritchie Bros. Auctioneer, an auctioneer of used industrial equipment, to sell some of its equipment. The auction contract made Thomas responsible for identifying the creditors holding an interest in the equipment to be auctioned. Thomas identified KeyBank National and Wasser as its creditors.

Ritchie then informed Wasser that Ritchie was arranging a sale of the equipment securing the Thomas obligations. Ritchie wanted to auction the equipment free of any liens. Ritchie sent Wasser a release form (Release # 1) asking for Wasser's consent and requested payoff figures for Wasser's liens. Release # 1 gave Wasser three options: disclaim any interest in the equipment or its proceeds; accept the net proceeds earned from the auction; or accept payment of a fixed amount. Ron Berg, Wasser's vice president, returned Release # 1 by fax on March 1, 2004. Berg chose the fixed amount option and set the proposed payoff figure as $331,078.55, the amount of Thomas's total debt to Wasser.

On March 29, 2004, Ritchie employees held an internal telephone conference to discuss the Thomas auction. The conference included Karl Werner, regional manager for Ritchie's Northwest Division. He was responsible for approving or denying Wasser's request. During the conversation the Ritchie representatives identified liens held by Wasser, KeyBank, and HSBC. Werner compared the value of the equipment to Thomas's debt and would not agree to the payoff proposed in Release # 1.

Werner telephoned Wasser's Berg to discuss the terms of Wasser's proposed release. During the call, Berg asked Werner whether there were any IRS liens against the equipment. Werner put Berg on hold and asked John Meese of Ritchie's Settlement Department if Meese was "positive" there were no other liens; Meese stated "[t]hat's correct." Werner later testified that he informed Berg

there were no other liens. Werner apparently did not tell Berg about the HSBC lien because it was specific to pieces of Thomas's equipment in which Wasser did not hold a security interest.

This March 29 conversation between Berg and Werner is at the center of this lawsuit. According to Wasser, Ritchie agreed to pay Wasser up to approximately $331,000 from the net proceeds of the entire Thomas auction after discharge of the KeyBank lien. Thomas's auction equipment consisted of thirty-eight items in total; Wasser held a security interest in seven of those items. Wasser contends that the parties agreed that Wasser would receive net proceeds from sale of all thirty-eight items of Thomas's equipment and without consideration of the HSBC lien or any lien other than the KeyBank lien. But Ritchie asserts that Werner and Berg agreed that Wasser would receive only the net proceeds from the sale of the items of equipment in which Wasser held a security interest, and then only after Thomas's senior creditors were paid.

Ritchie prepared a new release form, Release # 2, based on the March 29 conversation with Berg. Release # 2 lists the seven pieces of Thomas's equipment in which Wasser held a security interest and states that Wasser accepts "NET PROCEEDS not to exceed $331,078.55 after KeyBank National payoff." Ritchie sent Release # 2 to Wasser and Wasser signed it without modification on March 29.

Ritchie held the auction on March 30, 2004. The Thomas auction was part of Ritchie's quarterly regional auction which included over 3,000 lots and generated gross sales exceeding twenty-three million dollars. The sale of all of Thomas's equipment resulted in gross revenue of $961,550 and net proceeds of $607,064.77. The sale of the seven items in which Wasser held a security interest yielded gross revenue of $174,000 and net proceeds of $127,063.88.

Meese informed Wasser's Berg on April 9 that Ritchie would pay Wasser $331,000 on April 21. On April 19 Ritchie issued a check payable to Wasser in the amount of $331,078.55. Before sending the check, Ritchie discovered various loggers' pension trusts that were claiming a priority interest in approximately $450,000 of the proceeds of the sale of all of Thomas's auctioned equipment. The equipment was also encumbered by tax liens in favor of the IRS and the Kodiak Island Borough. After discovering the additional liens Ritchie held the sale proceeds in a trust account. Ritchie withheld the Wasser check and eventually cancelled it.

On July 2 Thomas was forced into involuntary bankruptcy proceedings by the loggers' pension trusts. Ritchie filed an interpleader complaint in bankruptcy court and deposited the net proceeds—$607,064.77—from the entire Thomas auction into the court registry. The loggers' pension trust liens were subordinate to Wasser's lien, but the IRS and the Kodiak Island Borough tax liens had higher priority than the unsecured portion of Wasser's liens. The tax liens reduced Wasser's proceeds from sale of the seven pieces of equipment and consumed the excess proceeds from sale of the other Thomas equipment. Wasser agreed to a stipulated resolution of the creditors' entitlement to the interpleader funds and received $85,954.36 in net proceeds from the seven items in which it held a collateral interest. On July 22 Wasser sued Ritchie, asserting breach of contract, misrepresentation, promissory estoppel, and conversion. Ritchie removed the case to United States District Court for the District of Alaska, which referred the case to bankruptcy court.

In 2005 Ritchie moved for summary judgment in the bankruptcy court. After determining that a mutual mistake existed and that it was "more reasonable to have Wasser bear the risk" of the parties' mistake, the bankruptcy court granted Ritchie's motion and dismissed Wasser's lawsuit. The bankruptcy court later vacated its grant of summary judgment, noting that it did not have jurisdiction over Wasser's complaint because it was a state-law contract dispute. The district court then remanded the case to the superior court.

Ritchie moved for summary judgment in the superior court. That court concluded that "net proceeds" was limited to the items in which Wasser held a collateral interest,

reformed the contract to reflect payoff of all senior lien holders before the payoff to Wasser, and granted summary judgment to Ritchie. The court awarded Ritchie attorney's and paralegal fees totaling $24,048.

Wasser appeals the grant of summary judgment, arguing that the contractual term "net proceeds" includes proceeds from the entire Thomas auction, and that the superior court erred in allocating the risk of mistake to Wasser and therefore erred in reforming the contract. Both parties appeal the awards of attorney's fees and paralegal fees.

## III. DISCUSSION

### A. Standard of Review

■ We review grants of summary judgment de novo, drawing all reasonable factual inferences in favor of, and viewing the facts in the light most favorable to the non-prevailing party.[1] A grant of summary judgment will be affirmed when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law.[2] "Summary judgment is ... improper in contractual disputes 'when the evidence before the superior court establishes a factual dispute as to the intent of the contracting parties.'"[3]

■ Because the extrinsic evidence is not in dispute, we are not confined to the "clearly erroneous" standard in our review of the superior court's decision to grant summary judgment on the basis of its interpretation of a contract.[4] "In a case such as this, interpretation of a contract is treated in the same manner as a question of law."[5]

■ We review a superior court's award of attorney's fees for abuse of discretion and will uphold an award unless it is manifestly unreasonable.[6]

### B. Reformation

■ Wasser appeals the grant of summary judgment, arguing that "net proceeds" includes proceeds from the entire Thomas auction and that the superior court erred in reforming the contract. We turn first to the reformation issue because it turns out to be controlling in this case.

■ Reformation is an equitable remedy by which a court alters the terms of a written instrument to make the writing conform with the meaning that the parties agreed upon.[7] We have previously listed the circumstances under which reformation may be appropriate:

(1) mutual mistake of fact in which the [contract], as written, does not conform to the prior agreement of the parties; (2) fraud by one party which causes the other party to be under a mistaken belief as to the contents of the [contract]; (3) duress by one party which deprives the other party of any true freedom of choice; (4) unilateral mistake by one party and fraudulent or inequitable conduct by the other party, especially where the latter party knew of the other's mistake and kept silent; and (5) mistake of law . . . . [8]

The superior court determined that a mutual mistake existed because neither party was aware of the additional liens at the time of contract formation. The court therefore reformed the contract to require that all senior lien holders be paid before Wasser. The court stated that the reformation "com-

1. *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 166 (Alaska 2007); *Alaska Constr. Equip., Inc. v. Star Trucking, Inc.*, 128 P.3d 164, 167 (Alaska 2006).

2. *Alaska Constr. Equip., Inc.*, 128 P.3d at 167 (citing *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005)).

3. *Rockstad*, 113 P.3d at 1219 (quoting *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 712 (Alaska 2003)).

4. *Norton v. Herron*, 677 P.2d 877, 880 (Alaska 1984) (noting that extrinsic evidence—consisting of affidavits and depositions—merely restated parties' conflicting litigation positions).

5. *Id.*

6. *Laidlaw Transit, Inc. v. Anchorage Sch. Dist.*, 118 P.3d 1018, 1038 (Alaska 2005); *Parker v. Tomera*, 89 P.3d 761, 765 (Alaska 2004).

7. Restatement (Second) of Contracts § 155 cmt. a (1981).

8. *Adams v. Adams*, 89 P.3d 743, 752 (Alaska 2004) (quoting *Voss v. Brooks*, 907 P.2d 465, 468 (Alaska 1995)).

ports with Wasser's interest in the property. Since Wasser would have been subject to the senior lienholders, Wasser cannot recover more than it has already received from the distribution of proceeds in the bankruptcy court."

Wasser argues that reformation was not available as a matter of law because the written contract accurately conforms to the parties' agreement and that Ritchie bore the risk of mistake because it informed Wasser that no additional liens existed.

### 1. The superior court correctly determined the existence of mutual mistake.

■ We use a three-part test to determine whether there is a mutual mistake of fact.[9] To satisfy the test the party urging reform must show: "(1) the mistake relates to a 'basic assumption on which the contract was made,' (2) the mistake has a material effect on the agreed exchange of performances, and (3) the party seeking relief does not bear the risk of the mistake." [10]

Wasser first argues that there was no mutual mistake and that therefore reformation was not available because the written agreement accurately conveyed the parties' oral agreement.[11] A court may only reform a contract if "the words of the writing do not correctly express the meaning that the parties agreed upon." [12] Wasser essentially argues that the discovery of additional liens was irrelevant to the parties' agreement because the parties intended Wasser to be paid after KeyBank's payoff regardless of whether additional liens were later discovered. In effect Wasser asserts that Ritchie did not satisfy the second prong because the discovery of the additional liens did not have a material effect on the parties' agreed-upon performances.

We disagree. It is undisputed that neither party was aware of the additional senior lien holders when the parties entered into Release # 2. Both parties believed that Key-Bank was the only senior lien holder on the seven pieces of equipment in which Wasser held a security interest and this belief was a basic assumption of the agreement. The presence of the additional lien holders materially altered the agreement because it significantly reduced the net proceeds from the Thomas auction.

### 2. Ritchie did not bear the risk of mistake.

Wasser also argues that Ritchie did not meet the third requirement of the mutual mistake test because Ritchie, the party seeking reformation, bore the risk of mistake. In response Ritchie argues that it did not assume the risk of mistake because it did not guarantee the lien search.

■ Wasser is correct that a party which bears the risk of mistake cannot satisfy the mutual mistake test.[13] There are three acknowledged bases for allocating risk of mistake.[14]

First, one bears the risk of mistake if the contract allocates that risk to her.[15] This

9. *Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 108 (Alaska 2001) (determining that whether parties made mutual mistake regarding settlement agreement raised genuine issue of material fact, precluding grant of summary judgment).

10. *Id.* (quoting *Stormont v. Astoria Ltd.*, 889 P.2d 1059, 1061 (Alaska 1995)).

11. In a footnote to its opening brief, Wasser also contends that "Wasser continues to assert that the Superior Court erred in determining that Ritchie had not waived the defense of mutual mistake." Because Wasser devotes only a single sentence to this argument, we consider it waived. *Bodkin v. Cook Inlet Region, Inc.*, 182 P.3d 1072, 1076 (Alaska 2008); *Petersen v. Mut. Life Ins. Co.*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

12. ARTHUR L. CORBIN, 7 CORBIN ON CONTRACTS § 28.45, at 281 (2002).

13. RESTATEMENT (SECOND) OF CONTRACTS § 152(1); see *Mat–Su/Blackard/ Stephan & Sons v. State*, 647 P.2d 1101, 1104–05 (Alaska 1982) (refusing to find mutual mistake after unanticipated supply cost increase because contract expressly allocated burden of providing materials to contractor).

14. RESTATEMENT (SECOND) OF CONTRACTS § 154.

15. *Dickerson v. Williams*, 956 P.2d 458, 466 (Alaska 1998); see RESTATEMENT (SECOND) OF CONTRACTS § 154(a).

basis is inapplicable here. Release #2 is silent about whether Wasser or Ritchie bore the risk of additional liens. The Ritchie–Thomas Contract to Auction authorizing Ritchie to auction Thomas's equipment required Thomas to accurately identify all lien holders. It also states that "[Thomas] authorizes [Ritchie] to carry out title searches in respect of the Equipment at the expense of [Thomas], but in no case shall [Ritchie] have a duty to conduct, nor be responsible for the results of any such title search." Therefore Ritchie did not assume the risk based on its contracts with Wasser and Thomas.

Second, "[a] party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient."[16] This is sometimes referred to as "conscious ignorance."[17] This basis is inapplicable here because neither party had reason to believe that its knowledge might be insufficient.

Finally, if a contract does not allocate the risk of mistake and neither party bears the risk due to conscious ignorance, "[a] party bears the risk of a mistake when . . . the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so."[18] Wasser argues that Ritchie should bear the risk of mistake because Ritchie conducted the lien search and drafted the contract. Ritchie argues that Wasser should bear the risk of mistake because Wasser was on constructive notice of all recorded liens and had financial incentive to determine the existence of other liens.

 When allocating risk among parties, "the court will consider the purposes of the parties and will have recourse to its own general knowledge of human behavior in bargain transactions."[19] "[A] court has broad discretion in determining when to deny relief to a mistaken contracting party under the theory that a party bore the risk of the mistake."[20] The superior court was not asked, and did not explicitly state, which party bore the risk of mistake. But because the court determined that there was mutual mistake and reformed the contract in favor of Ritchie, the court impliedly determined that Wasser bore the risk of mistake.

Wasser cites our decision in *Fairbanks North Star Borough v. Tundra Tours, Inc.*[21] to argue that the risk of mistake should have been assigned to Ritchie because it "is allocated to the party who could have discovered the mistake, but did not." But there is no indication that Ritchie was the *only* party that could have discovered the liens. Wasser asserts that "Ritchie had a sophisticated lien search program that was unavailable to Wasser." Assuming that statement is true, there is no indication that Wasser did not have the capability of discovering the liens itself, nor is there any indication that performing its own search would have been so expensive or otherwise infeasible that relying on the Ritchie search was commercially necessary. As Ritchie points out, Wasser is a sophisticated company that had indisputably performed lien searches prior to releasing its interest in Thomas's equipment.

Wasser's reply brief asserts that "[t]here is no evidence in the record that the undiscovered liens were recorded. Indeed, the record suggests that those liens were not recorded." But assuming they were not recorded, this does not mean that upon inquiry Wasser could not have learned about the tax liens. At the very least, Wasser could have asked Thomas whether liens existed.

Wasser had particular reason to investigate whether its collateral was encumbered by additional liens. In late 2003 Thomas

---

16. RESTATEMENT (SECOND) OF CONTRACTS § 154(b).

17. *Id.* § 154 cmt. c.

18. *Id.* § 154(c).

19. *Id.* § 154 cmt. d.

20. 77 AM.JUR.3D *Proof of Facts* § 18, at 217 (2004).

21. *Fairbanks N. Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020, 1033 (Alaska 1986) (holding that because school district received detailed billing statements and paid total billed amount superior court reasonably allocated risk of mistake to school district based on contract that was ambiguous whether sign-off and sign-on times were compensable).

defaulted on its loan to Wasser, and Berg admitted that he was in "constant communication or frequent communication with Thomas after the default." Wasser therefore knew Thomas was in financial trouble.

Furthermore, we are persuaded by Ritchie's assertion that it was reasonable to allocate the risk to Wasser given the relative interests of the parties. As a secured creditor, Wasser had a direct financial interest in the equipment itself. As an auctioneer, Ritchie's only interest in the equipment was the commission the auction would generate. Thomas's debt of $331,078.55 to Wasser was secured by liens on the seven pieces of equipment, whereas Ritchie's commission on the sale of those seven items was less than $16,000. The amount available for payoff to creditors included the total proceeds less the auction costs—including Ritchie's commission. Ritchie would receive the same commission without regard to whether the parties were mistaken about additional lien holders; Ritchie's interest in accurate lien information was therefore markedly lower than Wasser's. Accurate lien information would determine where Wasser stood in the hierarchy of lenders; this information was of relatively little importance to Ritchie, but of great importance to Wasser.

Because of the relative disparity in the parties' interests in the consequences of undiscovered senior liens, it seems appropriate for Wasser to bear the risk of mistake. The only theoretical basis for allocating risk to Ritchie would be Ritchie's telephonic representation to Wasser that there were no IRS liens. This argument is bolstered by the fact that Ritchie's assertion was given to Wasser only one day before the auction. But given Wasser's paramount interest in whether there were other senior lien holders, and given the consequences to Wasser if Ritchie was wrong, Ritchie's innocent misrepresentation should not cause the risk of mistake to be reallocated from Wasser to Ritchie. Both of these sophisticated parties must have known that IRS liens or other senior liens would reduce the proceeds available to satis-

fy Wasser and that Wasser's interest would inevitably be subordinate.

Moreover, allocating the risk of mistake to Ritchie would expose Ritchie to liability far exceeding its possible interest, whereas placing the risk of mistake on Wasser would give Wasser essentially what it would have received had it known about the other liens. There is no reason to think that Wasser could have arranged an auction on terms that would have defeated the tax liens; there is therefore no reason to think Wasser would have been in a better position had it been fully informed about the liens. In other words, imposing the risk of mistake on Ritchie would have exposed it to consequences far out of proportion to those Wasser faced whether or not it was fully informed.

Wasser, citing *Old Harbor Native Corp. v. Afognak Joint Venture,*[22] argues that "allocation of the risk of mistake is a question of fact, the evidence of which must be construed in Wasser's favor." But *Old Harbor Native Corp.* does not establish that the allocation of risk of mistake is a question of fact. In that case, we did not allocate the risk of mistake to either party.[23] We determined that the evidence, when viewed in the light most favorable to the non-prevailing party below, supported the contention that the parties made a mutual mistake and therefore concluded that the superior court erred in dismissing the mutual mistake claim.[24]

As Ritchie notes, it "was simply an auctioneer, and was not acting as a title company for Wasser.... Ritchie Bros. was neither the buyer nor seller of Thomas's equipment, and had no interest in the items; as the auctioneer, Ritchie Bros. was simply an agent for the seller." As Ritchie argues, it is counterintuitive to think that the risk of mistake ought to be on the auctioneer under these circumstances. Wasser has provided no case authority that would overcome that intuitive notion, and Wasser produced no evidence to justify a finding that Ritchie bore the burden of risk of mistake. We conse-

**22.** *Old Harbor Native Corp. v. Afognak Venture,* 30 P.3d 101 (Alaska 2001).

**23.** *Id.* at 108.

**24.** *Id.* at 109.

quently allocate the risk of mistake to Wasser as a matter of law.[25]

### 3. Ritchie's innocent misrepresentation did not cut off the possibility of reformation.

Wasser additionally argues that Ritchie assumed the risk that its representation that there were no additional liens was not accurate and that Ritchie's misrepresentation terminated the availability of reformation.

■■■■■ Alaska law states that a party has " 'a duty to provide accurate information' once one undertakes to speak." [26] But a party has no right to rely on another party's representations if doing so would be "so negligent as to amount to 'a failure to act in good faith and in accordance with reasonable standards of fair dealing.' " [27] In rejecting Wasser's separate misrepresentation claim,[28] the superior court stated that "Wasser could not have justifiably relied on Ritchie statements that there were no other liens because Wasser itself should have investigated what liens existed."

Wasser argues that whether it was justified in relying upon the statement, and therefore whether Ritchie assumed the risk of mistake by making the statement, is an issue of fact that precludes the grant of summary judgment. Wasser is correct that whether reliance is justified is ordinarily a question of fact material to a misrepresentation claim.[29] But if "reasonable minds could reach but one conclusion" the issue may be determined as a matter of law.[30] The three cases [31] Wasser cites note that whether one party justifiably relied upon another is ordinarily a question of fact, but none supports Wasser's contention that it was reasonably justified in relying upon Ritchie.

In *Industrial Commercial Electric Inc. v. McLees*, we stated that "[w]hether reliance is justified in a given case seems to us more likely to turn on the course of dealings between the parties before and during the dispute." [32] Berg testified that Wasser had several items auctioned by Ritchie prior to the Thomas auction, but he did not recall that any of the previous auctions was conducted consistent with Wasser's proposed interpretation here that the parties intended to

**25.** *See Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 752 (Minn.1985) (holding that mutual mistake existed after allocating risk of unanticipated circumstances on city as matter of law because contractor had right to rely on city's specifications in making bid).

**26.** *Barber v. Nat'l Bank of Alaska*, 815 P.2d 857, 862 (Alaska 1991) (quoting *Bevins v. Ballard*, 655 P.2d 757, 760 (Alaska 1982)) (knowing or negligent misrepresentation cases).

**27.** *Cousineau v. Walker*, 613 P.2d 608, 614–15 (Alaska 1980) (citing RESTATEMENT (SECOND) OF CONTRACTS § 314, cmt. b (Tent. Draft no. 11, 1976)).

**28.** In the superior court, Wasser asserted a misrepresentation claim against Ritchie as an alternative cause of action. Wasser has not pursued its direct misrepresentation claim on appeal but nonetheless argues that Ritchie assumed the risk of mistake through its misrepresentation.

**29.** *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 914–15 (Alaska 2006), states:

Although some courts appear to hold that determinations as to whether reliance was justified can be a question of law reviewed de novo, our own precedents suggest that it is a question of fact, and it seems that most jurisdictions that have addressed the issue say it is either a purely factual issue or a mixed question of law and fact, to be reviewed for clear error in either event.

**30.** *Id.* at 914–15; *accord Barnes v. Cornerstone Invs., Inc.*, 54 Wash.App. 474, 773 P.2d 884, 886–87 (1989) (holding that appellants did not create triable issue of fact with regards to justifiable reliance because submitted affidavits did not place any facts at issue); *see also Vigortone Ag Prods., Inc. v. PM Ag Prods., Inc.*, 217 F.Supp.2d 858, 865 (N.D.Ill.2001) ("The issue of justifiable reliance is a question of fact, but it can be decided on summary judgment when no reasonable jury could find that it was reasonable for a plaintiff to rely upon the defendants' statements."); *Keenan v. Allan*, 889 F.Supp. 1320, 1386 (E.D.Wash.1995) (stating that justifiable reliance "can be decided on summary judgment if reasonable minds would reach only one conclusion").

**31.** *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905 (Alaska 2006); *Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593 (Alaska 2004); *Ambassador Ins. Co. v. Kenneth I. Tobey, Inc.*, 618 P.2d 572 (Alaska 1980).

**32.** *Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593, 601 (Alaska 2004).

allow full payoff to Wasser regardless of whether senior liens existed. Wasser has not shown that the parties' prior dealings or their dealings during the Thomas auction could support a finding that Wasser's reliance was justified. In *Ambassador Insurance Co. v. Kenneth I. Tobey, Inc.*, we held that because misrepresentations were made by an authorized agent that had apparent authority, the issue of whether reliance was justified precluded summary judgment.[33] But that case is distinguishable because even though Ritchie was an agent of Thomas, it was an unrelated, third-party agent and as such Ritchie was not making an authoritative statement about Thomas's equipment. In *Anchorage Chrysler Center, Inc. v. Daimler-Chrysler Corp.*, we determined that the superior court did not err in finding, after trial, that the plaintiff's reliance upon an email was unjustified because the email was so "hedged." [34]

Wasser asserts that "[a]uctioneers have no special license to make misrepresentations, even if negligently or innocently, regarding the status of property they are selling. Wasser had every right to rely on Ritchie...." Ritchie is not a title company. And although Wasser is not a purchaser or owner of auctioned equipment, it is significant that Ritchie does not guarantee clear title even to its auction purchasers and that its Contract to Auction specifically disclaims any duties or liabilities regarding any title search. Ritchie is an auctioneer involved in the business of appraising and valuing equipment. Wasser admits that Ritchie would not guarantee a payoff based on Ritchie's valuation. Wasser could not reasonably rely on Ritchie's title search knowing that Ritchie is not a title company, when Wasser knew that Ritchie was even unwilling to guarantee its valuation estimates, an area in which Wasser asserts that Ritchie is an "expert."

We determine that Wasser's proffered evidence is insufficient to support a finding that Wasser was justified in relying upon Ritchie's misrepresentation. We therefore conclude that the undisputed evidence regarding the parties' relative interests establishes that Wasser's reliance was unjustified as a matter of law; there is consequently no genuine issue of fact whether Ritchie assumed the risk of loss based on its misrepresentation.

Wasser similarly argues that Ritchie's misrepresentation terminated the availability of reformation. In support, Wasser cites *Hercules Machinery Corp. v. McElwee Bros.*, in which the court refused to reform a contract entered into after one party relied upon the misrepresentation of another.[35] In that case, a construction company sent a detailed inquiry with job specifications to an equipment supplier and asked whether the supplier's pile driver could adequately perform the job; the seller answered affirmatively.[36] The court held that the seller bore the risk that the pile driver would fail to meet the buyer's specifications and refused to rescind the contract for mutual mistake because of the seller's affirmative representations.[37] Even though a buyer of sophisticated equipment supplying detailed specifications may rely on the assertions of a seller, Wasser could not, for the reasons discussed above, reasonably rely on Ritchie's assertions. Ritchie's innocent misrepresentation therefore did not cut off the possibility of reformation.

### 4. Ritchie proved mutual mistake by clear and convincing evidence.

A party urging reformation must establish the elements of reformation by clear and convincing evidence.[38] Wasser argues that Ritchie failed to meet this "high burden of proof for the extraordinary relief of reformation." In support, Wasser reiterates the arguments discussed above. It argues that there was a question of fact as to whether

**33.** *Ambassador Ins. Co. v. Kenneth I. Tobey, Inc.*, 618 P.2d 572, 574 (Alaska 1980).

**34.** *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 914–15 (Alaska 2006).

**35.** *Hercules Mach. Corp. v. McElwee Bros.*, 2002 WL 31015598 (E.D.La.2002).

**36.** *Id.* at *4.

**37.** *Id.* at *9.

**38.** *Adams v. Adams*, 89 P.3d 743, 752 (Alaska 2004).

the parties intended to pay senior lien holders before paying Wasser. It also argues that the mistake was the result of Ritchie's inaccurate lien search and that the burden of additional liens should therefore fall on Ritchie.

 The superior court did not state in its opinion the standard of proof it applied to Ritchie's reformation argument. A superior court does not need to explicitly state the standard of proof it is applying if there is no dispute about the applicable standard.[39] We will normally assume that the superior court has applied the correct standard.[40]

There is no indication the superior court applied an incorrect standard. The superior court noted that "[r]escission is another remedy available when the defense of mutual mistake is argued. A party seeking to rescind a contract on the basis of mutual mistake must show by clear and convincing evidence that the agreement should be set aside." Because the superior court correctly acknowledged that mutual mistake must be shown by clear and convincing evidence in the context of rescission, because Wasser asserted below that the clear and convincing standard applied to reformation, and because Ritchie never asserted that any other standard applied to reformation, we conclude that the superior court understood that mutual mistake must be shown by clear and convincing evidence in the context of reformation as well. From this we can safely assume the superior court recognized and applied the correct standard. Therefore, the superior court did not err in granting reformation.

Wasser additionally argues that the superior court erred in determining that "net proceeds" was limited to sale of those items of Thomas's equipment in which Wasser held a security interest. Because we hold that the contract was properly reformed, there are no proceeds from the other equipment available

to pay Wasser; we therefore do not need to address this issue.

## C. Attorney's Fees

Ritchie asked the superior court for an enhanced award of attorney's fees under Alaska Civil Rule 82. Wasser partially opposed the motion, arguing that Ritchie did not establish grounds for enhancement and that Ritchie improperly included fees for paralegal work. The superior court declined to award enhanced fees but awarded Ritchie $24,048 under Alaska Civil Rule 68. The fees subject to the Rule 68 offer of judgment totaled $32,064, including paralegal fees of $2,164. Because the superior court awarded Ritchie seventy-five percent of the total fees Ritchie had incurred, Ritchie was awarded paralegal fees totaling $1,623.

 Wasser appeals the paralegal fees award. Rule 82(b)(2) provides that "[t]he actual fees shall include fees for legal work customarily performed by an attorney but which was delegated to and performed by an investigator, paralegal or law clerk." Wasser argues that Ritchie included fees for paralegal work not "customarily performed by an attorney." Ritchie argues that Wasser waived this objection by not referring the superior court to specific time entries. But Wasser did object to the inclusion of paralegal fees by arguing below that "Ritchie has made no showing that the work performed by these individuals was of a type 'customarily performed by an attorney', and a cursory review of the narrative establishes that it was not."[41] Accordingly, we remand this part of the case with directions that the superior court determine what portion of this work may be included in the fee award under the standard expressed in Rule 82(b)(2).[42]

 Ritchie cross-appeals the superior court's denial of Ritchie's request for en-

---

**39.** *Anchorage Police & Fire Ret. Sys. v. Gallion,* 65 P.3d 876, 883 (Alaska 2003).

**40.** *Id.*

**41.** On appeal, Wasser points to entries describing the work as "[c]ompil[ing] and mark[ing] trial exhibits" and "[p]repar[ing] key documents binder."

**42.** *See Nielson v. Benton,* 903 P.2d 1049, 1054 n. 8 (Alaska 1995) (remanding attorney's fee award and directing superior court to review paralegal work charged and determine what portion could be included in fee award).

**84**

hanced fees.[43] Rule 82(b)(3) provides that "[t]he court may vary an attorney's fee award calculated under subparagraph (b)(1) or (2) of this rule if . . . the court determines a variation is warranted." To determine whether a variation is warranted we consider factors that include "the complexity of the litigation" and "the reasonableness of the claims and defenses pursued by each side."[44] Ritchie argues that the fee award should be remanded with instructions to depart upward from the Rule 82 schedule because Wasser's claims were patently unreasonable and its litigation strategy significantly increased the complexity of the case.

Ritchie argues that Wasser could not have reasonably believed it was entitled to net proceeds from the sale of all of Thomas's equipment regardless of the existence of any additional liens. Ritchie also asserts that Wasser refused to clarify the legal basis for its claims "to give the illusion of unresolved issues of fact and law." But although Wasser's interpretation of the contract may appear commercially implausible, it is not patently unreasonable, nor does Wasser's litigation strategy appear to have made the litigation unduly complex.[45] The superior court "believe[d] any further enhancement is not warranted" and nothing in the record indicates that the court abused its discretion by declining to award enhanced fees.

## III. CONCLUSION

For these reasons, we REMAND for reconsideration of the paralegal fees award, but otherwise AFFIRM the judgment below.

BRYNER, Justice, not participating.

---

**43.** Although Ritchie is not barred from seeking enhanced fees under Rule 82, if it were to receive enhanced Rule 82 fees exceeding the Rule 68 fees that were awarded, it would be precluded from receiving the Rule 68 fees; if, on the other hand, enhanced fees were awarded that did not exceed Ritchie's Rule 68 award, Ritchie would be barred from collecting the enhanced Rule 82 fees because attorney's fees cannot be awarded under both Rule 68 and Rule 82. *See Ellison v. Steam Fitters Union Local 375,* 118 P.3d 1070, 1078 (Alaska 2005).

**44.** Alaska R. Civ. P. 82(b)(2)(A), (F).

**45.** *Cf. Cole v. Bartels,* 4 P.3d 956, 959–61 (Alaska 2000) (affirming superior court's award of enhanced fees after determining that appellant had pursued inconsistent legal positions and joined third-party defendants on claims lacking factual support).